# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SAID ALAN ANGULO-GAXIOLA,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING MOTION TO SUPPRESS**<br><br>Case No 4:23-cr-00039- RJS-PK<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Paul Kohler |

Defendant Said Alan Angulo-Gaxiola is charged with 1) Possession of Methamphetamine with an Intent to Distribute; and 2) Possession of Fentanyl with an Intent to Distribute.[1]  The charges stem from a traffic stop on Interstate-70 in Elsinore, Sevier County, Utah.  On Saturday, March 18, 2023, near six o'clock on a sunny spring night, Sevier County Sheriff's Deputy Bodee Wells stopped a truck Said[2] was driving because Wells suspected its dark window tint violated Utah law.  Said did not have a driver's license but produced valid border crossing cards issued by the United States to him and his passenger, his brother Saul Angulo-Gaxiola.  Said also offered that Saul had a Mexican driver's license.  But Wells did not ask for Saul's license, or the truck's vehicle registration, or proof of insurance.  The border crossing cards and the names on them confused Wells, who had only been working as a patrol officer for a few weeks.  So he requested help from Sevier County Sgt. Aaron Richards.

Thus began a nearly thirty-minute stop involving delays in obtaining standard information, misunderstandings by the officers, and suspicion allegedly arising both from those

---

[1] Dkt. 1, *Indictment* (charging two counts of violating 21 U.S.C. § 841(a)(1)).

[2] Because the court will refer to both Said Angulo-Gaxiola and his brother Saul Angulo-Gaxiola throughout this Order, their first names are used.

misunderstandings and other circumstances.  A citation was not completed nor was the window

tint level checked before another officer, Trooper Bagley, arrived to conduct a 'K-9 sniff' of the

truck.  That sniff began over twenty-nine minutes after the stop was initiated.  The dog quickly

alerted on the truck, which was then searched, yielding fifty pounds of suspected

methamphetamine and two-and-a-half pounds of suspected fentanyl.

 Before the court is Said's Motion to Suppress all physical evidence obtained and all

statements he made after the allegedly unreasonably prolonged the traffic stop of his truck.[3]  He

argues the search violated the Fourth Amendment's prohibition of unreasonable searches and

seizures because the officers "unreasonably extended the traffic stop, without reasonable

suspicion, which resulted in allowing time for the K-9 unit to arrive."[4]  The United States

opposes the Motion.[5]  For the reasons discussed below, the court GRANTS Motion.

## BACKGROUND

 Wells and Richards wore body cameras and recorded essentially the entire time they were

engaged in the traffic stop.  Their body camera recordings were entered into evidence at an

evidentiary hearing on November 8, 2023, along with a copy of Said and Saul's border crossing

cards and Saul's Mexican driver's license.[6]  The body camera footage captures Said's actions

and conversations with the officers, most conversations between the officers, and many

---

[3] Dkt. 28, *Defendant's Motion to Suppress,* at 2; Dkt. 61, *Defendant's Memorandum in Support of Motion to Suppress*, at 21.

[4] Dkt. 61 at 7.

[5] Dkt. 62, *United States' Memorandum in Opposition to Defendant's Motion to Suppress.*

[6] Tr. 14 (admitting Exhibit 1, Deputy Wells' body camera footage), 24 (admitting Exhibit 2, copies of the border crossing cards and driver's license), and 84 (admitting Exhibit 3, Sgt. Richards' body camera footage).

communications between officers and dispatchers.  Wells, Richards, and Bagley also testified at the evidentiary hearing.[7]  Considering this evidence, the court sets forth the factual background.

Deputy Bodee Wells is a Patrol Deputy for the Sevier County, Utah Sheriff's Office.[8]  He assumed patrol duty in February 2023, moving from a prior position in the Sevier County Jail.[9]  Wells attended Utah's Peace Officer Standards and Training (POST) course "from November [2022] to February [2023]," after which he did field training with Sgt. Aaron Richards,[10] an eighteen-year veteran of the Sheriff's Office,[11] "for about a month before [he] went out on [his] own."[12]  At that point, Richards "was feeling confident that [Wells] could start doing things on [his] own while still being under his supervision in a different vehicle."[13]  But Richards had told Wells that "if [he] needed any help to give him a call."[14]  At most, Wells had only been patrolling on his own for a few weeks before the stop on Saturday, March 18, 2023.[15]

That evening, Wells was in his patrol car alone, driving south on Sevier Highway, when a red truck with Nevada license plates pulled out in front of him at about 5:56 p.m.[16]  He noticed the tint on the truck's windows "was very dark" so he "flipped around [his] vehicle . . . got

---

[7] Tr. 6-80 (Deputy Wells' testimony), 80-110 (Sgt. Richards), 113-21 (Trooper Bagley).

[8] Tr. 6:21-24.

[9] Tr. 6:25, 7:1-4, 8-14.

[10] Tr. 9:10-13.

[11] Tr. 80:22-24.

[12] Tr. 7:15-25.

[13] Tr. 9:5-9.

[14] Tr. 9:24-25.

[15] Tr. 8:20-24, 23:15-19.

[16] Tr. 10:3-6, 16:24-25, 17:1-8.

behind him and performed a traffic stop on the on-ramp of the freeway."[17]  All of the truck's

windows were up when Wells initiated the stop[18] using his overhead lights.[19]

The weather that early evening, as depicted on the body camera footage, was sunny with

no clouds in the blue sky.  Trooper Wells testified he remembers it was "pretty cold" that

evening,[20] but on the body camera footage, neither Said nor any of the (what becomes four)

officers on the scene is ever wearing a coat or jacket and there is no visible breath vapor.  Indeed,

at one point while in his patrol car, the footage depicts Deputy Wells roll down his window

during a stretch he is in his car for a few minutes.[21]

The traffic stop began at about 5:57 p.m.[22]  Wells testified that it was "standard

[procedure] on all of our traffic stops" to "give [dispatch] the location, and what vehicle we are

out on, so other officers know where you are at, and dispatch can know what the vehicle was in

case anything were to happen. . . . Dispatch will run the plate."[23]

As the stop began, Wells, turned off his car's engine and radioed the truck's Nevada

license plate number and his location to dispatch, telling them he was on the Interstate 70 on-

ramp at mile marker 32.  Wells did not receive information back from dispatch on the truck's

---

[17] Tr. 10:6-9.  Trooper Wells testified that he ultimately did verify that the window tint was outside the legal limit. Tr. 10:10-12.  But as depicted on the body camera footage, he did not make any efforts to undertake this verification before Trooper Bagley conducted a K-9 sniff of the truck.  He testified that he "usually do[es] not measure the tint until the very end of my stop, just kind of – as I give them back their information, and whatnot, I will measure the tint and inform them of what their window tint is with my tint meter."  Tr. 10:15-19.  He testified  "[t]hat's just the practice I have always done," because he "rarely write[s] citations for window tint, when I do, it is because . . . it is very clear that it is too dark, so it is not a concern of it not being close to the legal limit."  Tr. 10:21-24.

[18] Tr. 10:25, 11:1-2.

[19] Tr. 17:16-18.

[20] Tr. 11:7-9.

[21] Ex. 1 at 29:19.

[22] Tr. 16:24-25, 17:1-8.

[23] Tr. 18:1-12.

registration based on the license plate.  Wells testified it is normal for dispatch to hold but not call out the registration information, unless there is an issue such as an associated warrant.[24]

Wells exited his car and approached the truck on the passenger side so he would not be in the path of passing traffic.[25]  By that time, the truck's four side windows were all rolled down. Wells testified he thought this was "kind of odd because it was cold outside," and "people only roll down one window to speak to us," so that raised some suspicion that the occupants were airing out the truck.[26]  Wells did not further investigate any odors, ask the occupants to roll up any windows, or ask why all the windows were down.

Wells testified that it is standard traffic stop procedure to approach a vehicle, ask for a driver's license and registration, make conversation, then return to the patrol car to obtain information from dispatch or his computer.[27]  It is important on a stop to determine if the driver has a valid license and that "it is safe for them to be operating a vehicle."[28]  In situations where the driver lacks a license, and a passenger has one, it is standard procedure to "try to let that driver leave, and only issue a citation to the driver that was driving without a license."[29] Unfortunately, Wells deviated from standard procedures in significant ways.  He did not ask for registration or insurance information and, as discussed throughout this order, did not ask for a driver's license from the passenger who had one until about twenty minutes into the stop.

Upon approaching the truck, Wells saw two young men inside, in the driver and passenger seats.  Wells asked the occupants how they were doing, then explained, "Hey, the

---

[24] Tr. 18:6-12.

[25] Tr. 18:19-24.

[26] Tr. 15:9-15.

[27] Tr. 12:11-17.

[28] Tr. 13:20-25.

[29] Tr. 13:12-19.

reason I stopped you, your window tint is way too dark.  I don't know what it is in Nevada.  Is that where you're from?"[30]  The driver—Said—responded that yes, he lived in Las Vegas, and he had the tint installed only a few days ago.  Said stated he had been concerned the tint might be too dark, but the installer reassured him and told Said he could "just come back and [get it] replaced" if there were any issues.[31]  Said apologized for the dark tint.[32]  Said had an accent, but Wells was able to understand him.[33]  Wells responded that Said would be allowed to have a dark tint on the back windows but began to explain that the fronts shouldn't be so dark.  Said offered to remove the tint, but Wells told him he didn't need to, that Wells had a tool to measure it, and that once he did, "we'll go from there."[34]

Wells thought it was "out of the normal" for Said to apologize and offer to remove the tint.[35]  He testified "most people traveling out of state, when I stop them for a window tint, they just say 'Oh, well, I don't live here, so it is not an issue.  I will just return home,' and that's usually the end of that."[36]  Wells believed Said's apology and offer to remedy the problem were "a little weird . . . nothing major . . . . Just that maybe there was a small amount of marijuana or something in the vehicle."[37]

Wells then asked Said "Do you have your ID on you, your driver's license?"[38]  Said responded that he had an ID, but not his license, but then just admitted he didn't have a license at

---

[30] Ex. 1 at 0:51.

[31] Ex. 1 at 1:02.

[32] Ex. 1 at 1:20.

[33] Tr. 19:2-5.

[34] Ex. 1 at 1:30.

[35] Tr. 15:16-19.

[36] Tr. 15:19-22.

[37] Tr. 22:1-6.

[38] Ex. 1 at 1:43.

all "right now."  Wells then followed up on Said's response, asking "You don't have a valid a

driver's license?"  Said answered "no."  Then, the following exchange occurred:

> Wells: [To the passenger, Saul] "Do you have a valid driver's license?"
>
> Said [answering for Saul]: "He doesn't, no,  He's from Mexico.  He's my brother, he's on vacation."
>
> Well: "Oh. So, he probably doesn't have one here in the United States."
>
> Said then responds that Saul does not have one from the United States, but "he's got one from Mexico if that would work?"
>
> Wells: "Ok, so neither of you have a driver's license *here*?"
>
> Said: "*From here*, no."
>
> Wells: "Ok.  Do you have a form of identification?"
>
> Said then apologized again.
>
> Wells: "That's ok.  We're just going to have to figure something out because you can't be driving without a driver's license, so we will go from here."[39]

Wells asked Said to help get "an ID" from Saul since he doesn't speak English.  Said complied,

and Wells gathered their border crossing identification cards.  Wells did not ask for or obtain

Saul's Mexican driver's license, or any proof of the truck's registration or insurance.  At this

point, just over three minutes had elapsed since the stop began.

Wells later testified concerning his failure to obtain Saul's driver's license at the stop's

outset, claiming he had "just missed" that Said told him Saul had a Mexican driver's license until

it was pointed out the day of the evidentiary hearing, watching his body camera footage:

> Q.     So were you able to determine during . . . that initial contact, whether or not they had driver's license?
>
> A.     The driver told me he did not have a driver's license.  I asked if the passenger did and the driver initially tells me no.

---

[39] Ex. 1 at 2:02.

> Q.      But in the clip, at one point, it appears that the driver says the passenger has a driver's license in Mexico.  Did you see that on the clip we watched?
>
> A.      Correct.  I had never noticed that until you actually pointed it out to me.  That—I just missed him mentioning the Mexico license of the passenger.[40]
>
> Q.      So going back to March 18th at the time of the stop, when that comment is made, you missed it?
>
> A.      Correct.  I didn't understand what he was saying initially.  He says, 'No he doesn't have a license,' and then went into the whole Mexico thing.  And I was still thinking of the 'No' he had told me.[41]

To the extent Wells testimony is understood to mean he had not heard that Said's brother had a Mexican driver's license, this understanding is inconsistent with the video footage showing him ask Said the follow up question, "Ok, so neither of you have a driver's license *here*?" and receiving Said's response, "*From here*, no."[42]

Wells testified his separate failure to request the truck's registration and proof of insurance as him 'spacing off,' caused by his unfamiliarity with and confusion upon receiving the border crossing cards from Said and Saul.  He testified, "I got so stuck looking at these cards that I had never seen, and thinking about my next step of how I was going to figure out the driver's license issue, where we were going to go from here, that I spaced even requesting those items of information."[43]

At that point, Wells took only the border crossing cards and returned alone to his car.  He was unsure what he was going to do, because "he needed to verify that there was no driver's

---

[40] Tr. 19:14-25.

[41] Tr. 20:1-6.

[42] Additionally, much later in the stop, Said reminded Wells his brother has a driver license, and Wells responded, "but it's from Mexico."  Ex. 1 at 20:09.  Wells nonetheless then retrieves the license and provides it to Richards to review.  The court is not suggesting Wells testified untruthfully—simply that he may not have clearly recalled the earlier interactions where it appears he understood both at the outset of the stop and then later that Saul had a Mexican driver's license.

[43] Tr. 21:3-8.

license before I could issue a citation or impound the vehicle because I wanted to make sure I had all the information before just impounding somebody's vehicle."[44]

In his car, Wells studied the unfamiliar cards, briefly took an unrelated phone call concerning a shift change,[45] and then returned to studying the cards for over a minute, without doing anything on his computer.[46]

A little later, he called dispatch to run two "subjects" for "27" (driver's license) and "29" (outstanding warrants) checks by name and date of birth.[47]  When dispatch responded, however, Wells failed to initially tell dispatch he was reading border crossing cards, and provided only Said and Saul's first and middle names, though the cards also provide their identical 'surname'—Angulo-Gaxiola.[48]  Unfortunately, Wells was unfamiliar with Mexican naming conventions, where a surname often has two names; or the English word 'surname' on the U.S.-issued cards as referring to the last name; or the phrase 'given name' on the cards as referring to the first and middle names.[49]  About thirty seconds after his initial request, Wells informed dispatch the cards are border crossing cards.  He then says to himself, "I don't even know where to start."[50]  Over seven minutes have elapsed since the stop began.

Wells testified that at some point while he was in his car, he saw that Said "had developed what is called tunnel vision," and "was looking into his driver's side mirror very

---

[44] Tr. 27:5-12.

[45] Tr. 29:24-25, 30:1-7.

[46] Tr. 30:13-14 (stating his hand was on his laptop but he "wasn't typing anything on it.).

[47] Tr. 31:16-24.

[48] Ex. 2.

[49] Tr. 25:19-24.

[50] Ex. 1 at 7:02.

intently" at Wells.[51]  He thought this was unusual in his experience, and it "was the first time [he had] a driver starting at me, not taking his eyes off me for several minutes at a time."[52]  This prompted him to remember to not "get stuck looking at [his] computer because that's when something [dangerous] in front of you can happen."[53]  He claimed this was the reason he had not yet run the registration on the truck—because he "was trying not to get sucked into looking at [his] computer."[54]

Nearly eight minutes into the stop, Wells called Richards[55] to get advice on how to proceed.[56]  As heard on Wells' body camera footage, Wells told Richards he didn't know "where to start on these two dudes," that he stopped them for window tint, "neither one of them have a driver's license," and all the windows are rolled down as if "they're trying to air [the truck] out." Wells told Richards the men are "way overly nervous," but he didn't know how to look up their border crossing cards.[57]  Richards asked Wells if the men spoke English, and Wells responded that one does, explaining "[o]ne says he's from Nevada and he just picked up his friend in Mexico."  Of course, that description is inaccurate in multiple ways.  Said did not state that he had "picked up" Saul in Mexico.  And Said told Wells Saul was his brother, not just a friend— which would explain their identical surnames on the border crossing cards.

---

[51] Tr. 27:20-25.

[52] Tr. 28:1-3.

[53] Tr. 28:4-6.

[54] Tr. 38:4-9.

[55] Ex. 1 at 7:42.

[56] Tr. 38:20-23.

[57] Initially, Richards told Wells  "I've never seen a border crossing card," and after Wells describes them to Richards, including the dates they are valid and that they are from Mexico, Richards stated, "There's no such thing as a border crossing card.  That I'm aware of.  I've never seen one."  Soon after, he does seem to understand the cards as "visas."

In any event, as the phone call continued, dispatch called out on the radio that there were no outstanding warrants for either of the 'subjects' Wells had called in to check.[58]  Richards then suggested to Wells that he run a '27' (driver's license check) out of Nevada, as well as a "Triple I"—a criminal history report associated with a driver's license.[59]

With Richards still on the phone, Wells asked dispatch to run a '27' (driver's license check) out of Nevada for 'Said Alan'[60]—again, using an incomplete name.  He decided to go ahead and ask for that even though Said told him he did not have a license at all because he had "kind of talked a little like he did.  But he didn't have it now, so that's why I had them run him because he was the driver. . . ."[61]  Eleven minutes into the stop, dispatch responded, stating they found no license for 'Said Alan.'  Richards then ended the call with Wells.[62]

A moment later, Wells exited his car.  Richards was now on the scene as well and approached Wells from behind.  Richards asked Wells who owned the truck.  Wells didn't have an answer, but handed Richards the two border crossing cards, saying "I didn't run it yet.  I'll go run it."[63]  Wells testified he meant that he would run the truck's registration.[64]

Nearly twelve minutes into the stop, Wells got back in his car and got on his laptop while Richards approached the truck to speak to Said.[65]  Thirteen minutes into the stop, Wells called dispatch to get a read on the '28'—the registration based on the truck's license plate information

---

[58] Tr. 40:9-15.

[59] Tr. 40:19-25, 41:1-6.

[60] Ex. 1 at 10:26.

[61] Tr. 41:19-25, 42:1.

[62] Tr. 27:19-20.

[63] Ex. 1 at 11:44.

[64] Tr. 44:2.

[65] Ex. 1 at 11:53.

he had provided at the stop's initiation—to see if it matched up with the prior name he gave them (Said Alan).[66]  This was the first time he had called dispatch to seek any information on the truck's registration.[67]  About thirty seconds later, dispatch responded that the 2019 pickup was registered to 'Said Alan Angulo-Gaxiola' out of Las Vegas.[68]  Wells acknowledged the return and was about to exit his car (nearly fourteen minutes since the stop began),[69] but dispatch radioed to ask if he wanted them to try the '27' (driver's license search) again with the "extended name."  Wells said "10-4" in response to dispatch's suggestion, and then remained in his car.

As he sat in his car, about fifteen minutes into the stop, Wells heard Richards on his radio call out to inquire, "K-9 available?"[70]  Dispatch responded quickly to say they "will look for one."  Wells then remained in his car and, as depicted in his body camera footage, seems to be doing no traffic-related tasks.  Wells disputes this perception, testifying that "[a]t that time, I was verifying all of the vehicle's information and still trying to locate the driver's license with the new information I had been provided."[71]  Then, at the 15:46 mark, dispatch can be heard stating that a K-9 is en route.  Wells remained in the car a little longer, until over sixteen minutes had elapsed.[72]  Wells testified that when he finally exited the car, he lacked the information he

---

[66] Ex. 1 at 12:59.

[67] Tr. 44:19-25.  Wells testified he asked for the read back at this time because "This was the moment I realized I had ran the wrong name and there was more to it, so that's why I asked them to give me a read back so they would say it, and then they could notice the mistake I had made as well."  Tr. 44:12-15.  This explanation is difficult to understand, as there is nothing to suggest at this time Wells was aware of his misunderstandings about the names before he asked for the return from dispatch.  In any event, the facts remain he had not obtained to this point the truck's registration information either from Said or from dispatch, any proof of insurance, or Saul's Mexican driver's license.

[68] Ex. 1 at 13:30.

[69] Ex. 1 at 13:53.

[70] Ex. 1 at 14:57.

[71] Tr. 46:1-3.

[72] Ex. 1 at 16:18.

needed to resolve the stop— "proof of whether there was a driver's license present and whether the vehicle would need to be impounded, or cited, or what we were going to do."[73]

While Wells was in his car for a little over four minutes, Richards was speaking to Said. Richards' body camera captured his conversation and activity.  Richards first approached the truck's driver's side and began to talk to Said through the window.  Richards asked Said, "How are you guys?  Doing alright?  Your truck?" Said responded that it was "mine and my uncle's truck."[74]  Over twelve minutes into the stop, Richards asked Said for the truck's registration—the first time an officer asked for it.[75]  Said responded that he had it and reached for it.  Richards then asked if Wells had already taken the registration.  Said told him he had not.  Richards repeated the same question, asking, "Did the officer already get your registration?  Said again responded that he had not.

Said then apologized and offered to remove the window tint.  He told Richards, as he had told Wells—that he got the tint done a couple of days ago, and he thought it was too dark, but it is very hot in Nevada.  Richards assured him, "No, you're alright."  Richards then asked, "You're just passing through, right?"[76] Said answered yes, and told Richards he and Saul are on their way to help a friend with drywall.[77]  Richards interrupted Said, asked him to get his registration, and instructed him they would talk outside.[78]

---

[73] Tr. 46:18-25, 47:1-2.

[74] Ex. 3 at 0:49.

[75] Richards testified he asked for the documents so he could compare the "paper registration with the rear plate" and look at the registration to compare it to the VIN (Vehicle Identification Number) on the truck's window.  Tr. 86:1-3. He agreed this is a standard procedure on a traffic investigation.  Tr. 86:4-5.

[76] Ex. 3 at 1:25.

[77] Ex. 3 at 1:33.

[78] Ex. 3 at 1:34.

Said gathered his documents and prepared to exit the truck.  Richards indicated Saul should stay in the truck.  Richards then said to Said, "no *pistole*?"  Said responded no, he did not have a gun, and began again to exit the truck.  Before he could, Richards asked, "This is your uncle's truck?"[79]  Said responded that it was, he and his uncle got it a few months ago.  He handed Richards the registration and insurance information.  Richards asked Said his name.  Said responded with his name.  Richards continued questioning:

Richards: "What's your uncle's name?

Said answered that his uncle's name was Adrian.

Richards:  "How long you been in the States?"

Said responded he had been in the United States about seven years, that he's "23 [years old], I came when I was 15."

Richards: "You just do drywall?"

Said answered that he does "drywall and some mechanic" side jobs.

Richards stood outside the truck, thumbing through documents Said had given him.  He stepped away from the window for a moment, and continued to thumb through them, then returned to ask more questions.  Seeing buckets in the truck's open bed, Richards asked Said, "What's in the buckets?"  The answer, and some additional comments or questions from Richards, are not clearly audible on the body camera footage.  Richards then again invited Said out of the truck and Said exited.[80]  At this point—over fourteen minutes into the stop—Richards began asking Said a series of questions:[81]

Richards: "So, how long have you known your friend?  What's his name?"

Said answered that he [the passenger] is his big brother, and his name is Saul.

---

[79] Ex. 3 at 1:52.

[80] Ex. 3 at 3:17.

[81] Ex. 3 at 3:23.

Richards: "He's your big brother?"

Said responded affirmatively, and offered that Saul is on vacation.

Richards: "From?"

Said answered that Saul is from Mexico.

Richards: "He's just on vacation?"

Said: "Yeah."

Richards: "What part of Mexico?"

Said responded that Saul is from Sinaloa.

Richards: "What part of Mexico are you from, Sinaloa too?"

Said responded that he was from Sinaloa when he was young and he went to school there.
Upon hearing that answer, Richards paused questioning and immediately called out on his radio
for a K-9.  Recall, fifteen minutes had elapsed since the stop began.[82]

Richards then continued questioning Said:

Richards: "So when did he [Saul] cross the border?"

Said: "Like a month ago, a couple months ago.  He's going back . . . next week."

Richards: "He's going back next week?"  "And you're going where?"

Said: "We're going to Denver."

Richards: "How long [are] you going to be in Denver?"

Said: "Just for the weekend, I've got to come back and work Monday."  Said is a foreman
and has a couple guys working for him.

Richards: "Good money?"

Said responded that he earns about $1,500 per week.

Richards: "That's good."

Richards: "You got a kid too?"

---

[82] Ex. 3 at 3:48.  This call for a K-9 takes place on Wells' body camera footage (Ex. 1) at 14:57.

This question prompted Said to explain he and his wife are trying to have a child, but she is having some medical difficulties.

> Richards: "And his daughter's still in Mexico?"
>
> Said responded yes, that Saul has a family in Mexico.
>
> Richards: "What does [Saul] do in Mexico for work?"

Said responded that Saul went to electrician school, and then explained his father drilled water wells.

At this time, Wells had left his car and can be seen on both body camera videos approaching Richards and Said.  Richards continued questioning Said:

> Richards: "Do you have work in Denver?"
>
> Said: "Nah."
>
> Richards [interrupting]: "You're working the weekend?"
>
> Said: "No, my friend has a house, and he wants to do patches, so I'm trying to do the patches [and] and he's trying to paint the house and sell it.  Just doing a favor."
>
> Richards: "Does Saul speak English?"
>
> Said: "No, not really. We were just stopping to get some food and gas."

By this time, over seventeen minutes into the stop, Wells stood with Richards and Said outside and began to ask Said more questions.  Wells testified he decided to ask more questions because he "realized that [Sgt.] Richards had become suspicious, and called for a K-9, and there was more going on.  So I engaged in the activity of asking some traditional questions of 'Where are you going?  Where are you coming from? to try to build my own suspicion."[83]

So, in this effort to build his own suspicion, Wells began to question Said—asking, as Richards already had, questions about travel plans, including where Saul was from, if Said had

---

[83] Tr. 48:5-11.

"just barely" picked Saul up—seemingly referring to Mexico, "or has he been living in Vegas?"[84]  Said responded, "No.  He came from a bus, on a pass from Mexico."  Wells asked how long ago Saul arrived, and Said responded, "Like a couple months.  He's going back . . . next week.  He's got his family over there."

Said then apologized again, and explained he had been told the window tint's darkness would lessen over time, and he offered to remove it.  Wells then asked Said if he has ever been in trouble for "not having a driver's license in Vegas," and Said admitted he had been in trouble for that once when he was in an accident in Las Vegas.[85]  Wells then told Richards that Said is the truck owner, and that dispatch was running the '27.'[86]  Hearing this, Said interjected that he is the owner along with his uncle, who co-signed.  Richards then asked Said, "Who's your [truck] loan through?"  Said responded the loan was obtained through the car dealer in Las Vegas.

Over nineteen minutes since the stop began, the officers and Said appear to be simply standing outside.[87]  Wells testified they were at that time still waiting for a response from dispatch on the driver's license check using Said's full and accurate name,[88] but no one contacted dispatch to prompt a return.

About this time, dispatch called out to say they were not getting anything back on checks on Saul, but they did get 'criminal' back on Said.  Wells did not follow up with dispatch at that time concerning this development.  Said, attempting to make conversation, asked Wells about the

---

[84] Ex. 1 at 17:20.

[85] Ex. 1 at 18:21.

[86] Ex. 1 at 18:41.

[87] Ex. 1 at 19:29.

[88] Tr. 49:15-18.

weather and if it gets cold in the area.  Wells responded it can get cold, but it was finally warming up.[89]  Richards walked back to his patrol car during this exchange.[90]

At that time—about twenty minutes into the stop—Wells thought he could not chart a path to complete the stop because he "didn't have a licensed driver, or proof of a non-licensed driver, and I didn't know whether we were going to impound or not."[91]  Wells testified that it was standard practice that if passenger had a valid license, Wells would not impound even if the driver did not have a license.[92]

So, Wells told Said, "Well, we're trying to figure out what we're going to do, because like I said, you can't drive without a driver's license."[93]  Said responded that his brother could drive, that he "has a license, it's not from here. . ." and Wells interrupted, "but it's from Mexico."[94]  Wells then asked if Saul had the actual license.  Said quickly obtained the license from Saul (still sitting in the truck) though the truck's passenger-side window, twenty minutes and thirty-four seconds into the stop.

Wells testified that when he received the license, he understood for the first time there was a driver with a license, because he had been "under the impression there was no license present," in part because when a stop begins and he asks "for identification, usually people provide me their driver's license not their visa cards."[95]  This explanation seems incongruent with the fact that when Said reminded Wells that Saul had a license, Wells responded on the

---

[89] Ex. 1 at 19:45.

[90] Ex. 1 at 19:50.

[91] Tr. 49:25-50:1-2.

[92] Tr. 49:2-8.

[93] Ex. 1 at 20:00.

[94] Ex. 1 at 20:09.

[95] Tr. 50:21-25, 51:1-4.

body camera footage "but it's from Mexico," as well as his discussion with Said about the license at the outset of the stop.

Wells testified that at this point, he could finally resolve the traffic stop.[96]   Wells believed he could do this by either: 1) impounding the truck—something he would normally try to avoid doing—or 2) citing Said for the tint and driving without a license and allowing Saul to drive.[97]  If Said did not have driver's license information in Wells' computer system, the option to issue a citation would require him to input the information manually, which Wells estimated might take five to seven minutes."[98]

Rather than begin to work on one of those two options, Wells went to Richards' patrol car.  Richards had just requested 'EPIC' checks on both Said and Saul.[99]  Standing outside Richards' driver's side window, Wells handed Richards Saul's driver's license,[100] saying "the brother has that license, so that's the other kid."[101]  Wells explained he just got it after Said told him his brother had a license and "he just gave me that.  He went over and asked him for it."[102]

Rather than do anything related to the license, Richards then recounted to Wells his suspicions based what he thinks Said told him during his questioning:

---

[96] Tr. 51:15-17.

[97] Tr. 52.

[98] Tr. 53:1-11.  Wells was unaware of any return from dispatch on the Nevada '27' for Said using the corrected full name, and when he asked Richards if it had come back, Richards stated he didn't know.  Ex. 1 at 23:30.  Neither officer called dispatch to prompt a response.  Wells testified if he had received it from dispatch, the information for the citation would largely have auto-populated in his computer.  Tr. 53:1-5.

[99] Ex. 3 at 9:31.

[100] Ex. 3 at 9:45.

[101] Both Richards and Wells refer to Saul as "Sinoa" during their ensuing conversation about the license.  Richards scrutinized it, and asked Wells who had the license, and Wells responded "Sinoa."

[102] Ex. 1 at 21:11; Ex. 3 at 10:02.

> He told me they are going to Denver for vacation . . . first it was to work . . . then
> it was to vacation, visit a friend.  And then it was . . . be there a week, then when
> you coming home?  Monday.[103]

Of course, Said did not tell Richards he was going to Denver for vacation, or for regular work.

He told Richards he was going to Denver to help a friend patch a house so the friend could paint

it and prepare it to sell.  And he didn't tell Richards he would be in Denver for a week.  He told

him he would be there the weekend and had to be at work (at an unidentified time) on Monday in

Las Vegas.  Wells then offered "and [Said] told me he picked [Saul] up from Mexico and now

he's been here living in Vegas, so I don't. . . ."[104]  But Said didn't tell Wells that he had picked

up Saul in Mexico.  Richards then told Wells to look at Said's "body language."[105]  Wells

responded that Said appeared "shut down" and was "comforting himself," and that before, Said's

eyes had been "locked" on Wells.[106]

Wells asked Richards where he thought Bagley, the K-9 officer, was.[107]  Richards

responded, "They were up the canyon," and Wells offered, "He was hauling butt on the radio. I

can hear it."[108]

Wells testified he asked about Bagley because "I was trying to go write the citation and

continue with the stop.  If he wasn't there, we were going to continue with the stop regardless.

So I just kind of asked the question . . . in regards to if he was going to be here in time or not:"[109]

> Q.       Why was that a concern to you where Bagley was at?

---

[103] Ex. 1 at 21:37; Ex. 3 at 10:30.

[104] Ex. 3 at 10:50.

[105] Ex. 1 at 22:19; Ex. 3 at 11:13.

[106] Ex. 3 at 11:15.

[107] Tr. 56:21, 57:1-6.

[108] Ex. 1 at 23:16; Ex. 3 at 12:08.

[109] Tr. 56:21-25, 57:1.

A.      Because now we had developed all these suspicions that there was
potential drug trafficking or something more going on, so that's why the K-9 was
called for.  Now we did have those suspicions, so we were hoping to continue
with the traffic stop and have the possibility of having a dog.

Q.      But you also recognized you needed to get moving at this point?

A.      Correct.[110]

At the 23:30 mark—about three minutes after he had gotten Saul's license, Wells asked

Richards if dispatch had responded with the '27' information on Said's driver's license.

Richards responded, "I don't know."  Neither officer followed up with dispatch to prompt a

return, despite Richards' uncertainty.

Now nearly twenty-four minutes into the stop, it is unclear what, if anything, Richards is

doing related to the traffic stop.  And it is clear Wells was doing nothing to complete the citation.

Rather, he turned to chat with a third officer (not Bagley) who had arrived on the scene and was

also standing outside of Richards' car.[111]  Wells explained to this officer:

> Can't figure out who these people are.  And they're headed from Nevada to
> Colorado for work, vacation and they're coming home Monday.  Today's
> Saturday.  So very interesting . . .   He told me at first he just picked up his friend
> from Mexico, and then he told me that the friend's been staying in Vegas for
> awhile. . . .They both have visas. . . .The driver had no license. . . he told me up
> front he didn't have one.  He says the passenger has a Mexico driver's license.
> And this was like twenty minutes after we'd been trying to figure out who they
> are, he says that, so I just got that license.

Wells then stated, "Hoping Bagley [the K-9 officer] gets here soon."[112]

During this time, Richards can be seen on his body camera video slowly entering the

truck's license plate information into his computer.[113]  He does this despite having obtained and

---

[110] Tr. 57:7-15.

[111] Ex. 1 at 23:47; Ex. 3 at 12:38.

[112] Ex. 1 at 25:18.

[113] Ex. 3 at 12:54-13:37.

reviewed the paper registration document from Said, comparing it to the truck's VIN, and knowing dispatch already provided the return on the '28' on the same license plate, and Wells told him it had come back registered to Said.  He then scrolled through the return and shuffled through the identification and driver's license cards he held.[114]  He did these things for about a minute.[115]  He testified at the evidentiary hearing these were "quality checks"[116] into the "state returns dispatch had entered" and was "double checking their work by running the vehicle's registration to make sure it was coming back to the individuals that we had."[117]  He also testified he was comparing the name on Saul's driver's license to the name in "the state returns" to "try and identify the passenger."[118]

Over the radio, Richards and Wells heard Bagley confirm he is traveling eastbound. Wells told Richards to tell Bagley they were on the on ramp, and Richards did so.[119]  Wells then asked Richards if he should have Said get in the truck "so [Bagley] can get the dog out," but Richards told him to keep Said out of the truck.[120]  The officers then heard on the radio that Bagley had arrived at the scene,[121] over twenty-six minutes into the stop, at about 6:23 p.m.[122]

Upon hearing that, Richards immediately handed the documents held back to Wells, and told Wells he can "write a ticket, or whatever. . . [inaudible] through."[123]  Wells took the

---

[114] Ex. 3 at 14:14.

[115] Ex. 3 at 13:37-14:47.

[116] Tr. 98:3-4.

[117] Tr. 97:21-25.

[118] Tr. 98:9-13.

[119] Ex. 3 at 14:47.

[120] Ex. 3 at 14:57.

[121] Ex. 3 at 15:05 (hearing 10-23—meaning officer on scene).

[122] Ex. 1 at 26:20; Ex. 3 at 15:08.

[123] Ex. 3 at 15:10.

documents, walked away, but then quickly returned to Richards' car to ask if Saul's license was "an actual driver's license?  Do I have him drive?"[124]  Richards, though he had been holding, reviewing, and purportedly comparing the information on the license to other information at some length, stated "I'll have to read it," taking it back from Wells to review.[125]  Upon reviewing the license, Richards handed it back to Wells, and stated, "Yeah, it's a driver's license, but we'll just go from here."[126]  Wells then stated, "Ok, I'll just give him a citation for the tint and no driver's license."[127]  Richards told Wells to write the citation using information from the return on the registration check.[128]  To this point, the stop had lasted nearly twenty-seven minutes.[129]

Wells later testified that he planned to cite Said "for driving without a license and the window tint, and [he] was going to let the passenger of the vehicle with the Mexican license drive the vehicle."[130]  He charted this course though he was unaware if there had been a return on the '27' from dispatch—driver's license information on Said using his full and accurate name:

> Dispatch had not returned that information [on Said] to me, and now we did have a licensed driver. And he [Said] told me [he had] no license, so I felt confident I could cite him for that."[131]

---

[124] Ex. 3 at 15:20.

[125] Ex. 3 at 15:28.

[126] Ex. 3 at 15:36.

[127] Ex. 3 at 15:42.

[128] Ex. 3 at 15:59.

[129] Ex. 1 at 26:58.

[130] Tr. 58:3-7.

[131] Tr. 58:15-18.

Richards exited his car to help with the dog sniff.  Wells returned to his car to prepare a citation.[132]  He remained in his car for over four minutes.  While there, Trooper Bagley conducted the K-9 sniff of the truck.  From Richards' video, it appears the dog sniff starts at the truck[133] about nine minutes and ten seconds after Wells first handed Richards Saul's driver's license,[134] and three minutes and forty-five seconds after Richards handed Said and Saul's documents back to Wells and told him to work on the citation "or whatever."[135]

Wells testified that while this was dog sniff was happening, he "did watch the dog.  They are very amazing to watch, so while I was filling [out the citation], while he went around and indicated, I was watching that."[136]  At the 31:30 mark, Wells exited his car.  He had not completed the citation.  Indeed, upon exiting his car, he asked the other officers if he "should hold off on the citation or just write it out?"[137]  Richards said he could hold off on it.  He testified that he decided to wait to complete the citation after seeing the dog alert on the truck, because "now we had a reason to search the vehicle," and if they found anything, the citation could be different or simply moot if anyone was arrested.[138]

---

[132] At the evidentiary hearing, some suggestion that Wells may have been unable to complete the citation without the '27' return on Said's Nevada driver's license.  Tr. 59.  This was not Wells testimony before this discussion, and the fact he agreed with some suggestion that it was important to obtain information from dispatch can't change that.  He testified repeatedly that he was simply trying to find a license so he could make an impound decision, and when he obtained the Mexican driver's license over twenty minutes into the stop, he could make the decision about how to proceed.  Moreover, the record is not clear that dispatch never responded.  Wells asked Richards if they had responded, and Richards said he didn't know.  Thus, they might have, but no one followed up.  If it were critical, Wells or Richards could have contacted dispatch to prompt the response.  This never occurred.

[133] Ex. 3 at 18:55.

[134] Ex. 3 at 9:45.

[135] Ex. 3 at 15:10.

[136] Tr. 60:1-6.

[137] Ex. 1 at 31:30.

[138] Tr. 60:9-12.

An ensuing truck search resulted in the United States charging Said in May 2023 with Possession of Methamphetamine and Fentanyl with an Intent to Distribute.[139]  He has now filed a Motion to Suppress,[140] seeking exclusion of all evidence gathered and statements he made following the dog sniff on the grounds it violated his Fourth Amendment rights.[141]  The court held an evidentiary hearing on November 8, 2023.[142] After further briefing,[143] counsel offered final argument at a hearing on April 10, 2024.

## DISCUSSION

### I.     Applicable Legal Principles[144]

Said, as the proponent of a motion to suppress, "has the burden of showing the Fourth Amendment was implicated,[145] while the government has the burden of proving its actions were justified."[146]  It is the court's work to "assess the credibility of witnesses and determine the weight to give to the evidence presented; the inferences the district court draws from that evidence and testimony are entirely within its discretion."[147]

---

[139] Dkt. 1.

[140] Dkt. 28.

[141] *Id.* at 2.

[142] Dkt. 38, *Transcript.*

[143] Dkts. 61 and 62.

[144] Said argues in his briefing that he has standing to challenge the traffic stop because he owned and drove the truck that was stopped. Dkt. 61 at 7.  The United States does not dispute this point.

[145] *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020) (quoting *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994)).

[146] *Id.* (quoting *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010)).

[147] *Id.* (citing *United States v. Andrus*, 483 F.3d 711, 716 (10th Cir. 2007); *United States v. Kimoana*, 383 F.3d 1215, 1220 (10th Cir. 2004)).

The Fourth Amendment guards against unreasonable searches and seizures by the government.[148]  A traffic stop is subject to the Fourth Amendment's reasonableness standard because it "is a seizure for constitutional purposes."[149]

To meet this reasonableness standard, "a traffic stop must be justified at its inception and the officer's actions must be 'reasonably related in scope' to the 'mission of the stop.'"[150]  In *Rodriguez v. United States*, the Supreme Court instructs that "[a] seizure for a traffic violation justifies a police investigation of that violation."[151]  Because it is a "'relatively brief encounter,' a routine traffic stop is 'more analogous to a so-called *Terry*-stop . . . than to a formal arrest.'"[152] "Like a *Terry* stop, the tolerable duration of the police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violations that warranted the stop and attend to related safety concerns."[153]  A stop may last long enough to address the infraction, and not longer.[154]

 The tasks tied to the infraction include deciding "whether to issue a traffic ticket" and "'ordinary inquiries incident to [the traffic] stop,'" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the

---

[148] U.S. Const. amend. IV.

[149] *United States v. Frazier,* 30 F.4th 1165, 1173 (10th Cir. 2022) (citing *United States v. Cortez,* 965 F.3d 827, 833 (10th Cir. 2020)).

[150] *Frazier*, 30 F.4th at 1173 (quoting *United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020)).

[151] 575 U.S. 348, 354 (2015).

[152] *Id.* (quoting *Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (in turn citing *Terry v. Ohio*, 392 U.S. 1 (1968)) (other citations omitted).

[153] *Id.* (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (other citations omitted).

[154] *Id.*

automobile's registration and proof of insurance."[155]  These routine inquiries "ensur[e] that vehicles on the road are operated safely and responsibly."[156]

Officers may also engage in investigations unrelated to the purpose of the stop if they do "not lengthen the roadside detention."[157]  Put another way, "a traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket,"[158] unless there is "reasonable suspicion ordinarily demanded to justify detaining an individual."[159]  Otherwise, "[a]uthority for the seizure thus ends when tasks tied to the infraction are—or reasonably should have been—completed."[160]

The Tenth Circuit has summarized the foregoing principles, stating "[u]nder *Rodriguez*, therefore, an unlawful seizure occurs when an officer (1) diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, (2) in a way that 'prolongs' (i.e., adds time to) the stop, and (3) the investigative detour is unsupported by any independent reasonable suspicion."[161]  "Even *de minimis* delays caused by unrelated inquiries violate the Fourth Amendment."[162]

A K-9 dog sniff is "not an ordinary incident of a traffic stop," but is "a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'"[163]  Thus, when a sniff is employed, the

---

[155] *Id.* at 355 (quoting *Caballes*, 543 U.S. at 408).

[156] *Id.* (citations omitted).

[157] *Id.* (citations omitted).

[158] *Id.* (quoting *Caballes*, 543 U.S. at 407); *see also Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (stating a seizure remains lawful only "so long as [unrelated] inquiries do not measurably extend the duration of the stop.").

[159] *Id.* at 355.

[160] *Rodriguez*, 575 U.S. at 354 (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985) (noting in evaluating stop's reasonableness, "it [is] appropriate to examine whether the police diligently pursued [the] investigation.").

[161] *Frazier*, 30 F.4th at 1173 (citing *Rodriguez*, 575 U.S. at 357-58) (other citations omitted).

[162] *Mayville,* 955 F.3d at 829 (citing *Rodriguez*, 575 U.S. at 355-57).

[163] *Frazier*, 30 F.4th at 1173 (quoting  *Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000)) (other citations omitted).

critical question is "not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff prolongs--i.e., adds time to the stop.[164]  If it does, then under *Rodriguez*, it must be supported by reasonable suspicion.[165]  "The moment at which this reasonable suspicion becomes necessary is known as the '*Rodriguez*' moment."[166]

Said does not challenge the stop's initial justification, the window tint.[167]  But he argues: 1) "the tasks tied to the traffic stop for a window tint violation reasonably should have been completed much quicker than 29 minutes, the time it took for the k-9 unit to arrive and begin its search," and 2) Wells and Richards "diverted from the issue of the window tint in a way that prolonged the traffic stop, and that they lacked reasonable suspicion of criminal activity" to warrant the diversion.[168]

The court concludes the officers delayed the stop beyond what the traffic-based mission reasonably demanded, both 1) as a result of a mistakes and a lack of reasonable diligence, and 2) to investigate their suspicions about Said and Saul.  These delays were not based on reasonable suspicion.  Accordingly, the officers' actions violated the Fourth Amendment.

## II.     Did the Stop Take Longer than Reasonably Necessary to Complete its Mission?

Said first argues the traffic stop, for a window tint violation, should reasonably have concluded quicker than the twenty-nine minutes or so that elapsed before Bagley and his dog began the K-9 sniff, and that several actions, primarily by Wells, impermissibly prolonged

---

[164] *Id.* at 357 (citations omitted).

[165] *Id.* at 1616 (remanding to Eighth Circuit issue of whether reasonable suspicion justified adding time to an otherwise completed traffic stop to conduct a dog sniff).

[166] *United States v. Leon*, 80 F.4th 1160, 1165 (*United States v. Batara-Molina*, 60 F.4th 1251, 1255 n.1 (10th Cir. 2023)).

[167] Dkt. 61 at 8.

[168] *Id.*

the stop based on failures to follow procedures and other errors.  The United States responds that any diversions by the officers never prolonged the stop, because "throughout the entire contact, deputies were diligently, if imperfectly, pursuing the necessary tasks associated with the traffic stop.[169]  The court finds the United States' argument unpersuasive.

As noted above, the "tolerable duration" of a traffic stop is determined by its mission—to address the violation warranting the stop and attending to related safety concerns.[170]  The Tenth Circuit, citing *Rodriguez,* explains "an officer's authority to seize a motorist 'ends when tasks tied to the traffic infraction are—or reasonably should have been—completed:'[171]

> Thus, even ordinary inquiries incident to a traffic stop and permissible safety precautions must be completed within a reasonable amount of time.  In determining whether the duration of a traffic stop was reasonable, we consider whether the officers diligently pursued the mission of the stop.  Accordingly, officers may not undertake safety precautions for the purpose of lengthening the stop to allow for investigation of unrelated criminal activity.[172]

And in *United States v. Leon*, the Tenth Circuit recently reiterated that in considering the time reasonably required to complete a traffic stop, "it is appropriate to consider police diligence. . . ."[173]  But an officer is not required to complete the stop "'as fast as humanly possible.'"[174] "'This is because reasonableness—rather than efficiency—is the touchstone of the Fourth Amendment.'"[175]

In *United States v. Cortez*, the Tenth Circuit rejected the two defendants' argument that an officer had violated the Fourth Amendment by holding them at a traffic stop in New Mexico,

---

[169] Dkt. 62 at 24.

[170] *Rodriguez,* 575 U.S. at 354.

[171] *Mayville*, 955 F.3d at 831 (quoting *Rodriguez*, 575 U.S. at 354).

[172] *Id.* (citing *Rodriguez*, 575 U.S. at 356-57).

[173] *Leon,* 80 F.4th at 1165 (citing *Rodriguez*, 575 U.S. at 354).

[174] *Id.* (quoting *United States v. Campbell*, 912 F.3d 1340, 1353 (11th Cir. 2019)).

[175] *Id.* (quoting *Mayville,* 955 F.3d at 827); *citing Rodriguez*, 575 U.S. at 354.

fifty miles from the U.S.-Mexico border, on a highway without a border checkpoint, to wait for

Border Patrol to arrive on the scene.[176]  The officer initiated the stop based on speeding, but

seven minutes into the stop, called for Border Patrol to come to investigate the occupants,

including two adult men in the back of the subject truck.  The officer then continued to talk to the

driver, delayed issuing the citation, and asked the driver questions seemingly unrelated to the

stop.[177]  When Border Patrol arrived, the officer returned the driver's documents and issued a

citation.  But in the subsequent Border Patrol investigation, the male passengers admitted they

were "undocumented and in the United Stated unlawfully."[178]

 The driver and another passenger were charged with conspiracy to transport the men.[179]

The defendants then jointly moved the suppress evidence and statements obtained from the stop,

arguing it was extended without reasonable suspicion.  After the motion was denied by the

district court, the defendants appealed.[180]  The Tenth Circuit affirmed, concluding the officer had

developed reasonable suspicion of criminal activity about seven minutes into the stop.[181]

The court also rejected the defendants' argument that the officer had in those first seven minutes

"unreasonably prolonged the stop through delinquency and by asking questions unrelated to the

mission of issuing a traffic citation."[182]

---

[176] 965 F.3d 827 (10th Cir. 2020).

[177] *Id.* at 832.

[178] *Id.*

[179] *Id.*

[180] *Id.*at 833.

[181] *Id.* at 834-37.

[182] *Id.* at 837.

The court explained that nothing in the record suggested any "unreasonable delay or delinquency in the manner [the officer] conducted the first seven minutes of the stop."[183]  The officer had testified "that he completed the stop in a way that was consistent with his customary practice," and notably "the dashboard camera reveal[ed] nothing to the contrary."[184]  Specifically, the officer had in those initial seven minutes:

- Stopped a vehicle, a truck, with a female driver, and front seat passengers—an adult female and a young girl.[185]  (Two male adults were also in a back seat with a young boy, but the officer did not initially notice them.)

- Approached the truck and spoke to the driver about how fast she had been driving, and he requested an obtained from her a "license, insurance, and registration."[186]

- Per his practice, he asked the driver to stand at the right front bumper of his police car.[187]

- From the police car, ran the license through his computer system to check for warrants, and asked the driver "a series of questions regarding her travel plans and who she was traveling with."[188]  He also asked her what she did for a living, whose truck she was driving, about how long she had been in the town she had been traveling from—an Arizona town on the United States border with Mexico—and with whom she had been staying.[189]

- Checked the truck's VIN and asked the adult female passenger a series of questions similar to those he had asked the driver.[190]

At that point, the officer noticed the men in the back seat.  He asked the female passenger about them, and she became reticent to speak, but offered she did not know the men, and that

---

[183] *Id.* at 838.

[184] *Id.*

[185] *Id.* at 831.

[186] *Id.*

[187] *Id.*

[188] *Id.*

[189] *Id.*

[190] *Id.* at 831-32.

they had been picked up in a gas station.[191]  The officer asked the men for identification.  After they initially did not respond at all, they responded to a second request simply saying "no."[192] This was seven minutes into the stop, and as the court of appeals concluded, the officer had the requisite reasonable suspicion to contact and await help from Border Patrol.

In contrast to the seven minutes described in *Cortez*, the undersigned concludes the officers here delayed the conclusion of the stop not only to investigate criminal activity unrelated to the window tint, discussed below, but also simply due to delinquency or a failure to follow standard procedures.  Wells, still learning as a brand-new patrol officer, did not follow these procedures or diligently process information from Said.  These failures resulted in an unreasonably prolonged stop, impermissible under the Fourth Amendment.

First, Wells failed to ask for the registration and insurance paperwork at the outset of the stop, a part of standard procedure.  The registration would have immediately revealed the truck registered to Said in Nevada, much sooner than the nearly thirteen to fourteen minutes into the stop when Wells finally requested, then obtained, the return on the license plate information from dispatch and finally understood Said's 'extended' name.[193]  The registration and insurance documents would also have displayed Said's full name in a format Wells would certainly more clearly understand, thus confirming Said's actual name at the outset of the stop, permitting any further checks to be completed accurately much earlier, and presumably reducing or eliminating the time Wells spent studying the unfamiliar border cards.

---

[191] *Id.* at 832.

[192] *Id.*

[193] Said also faults Wells for providing wholly incomplete names to dispatcher and in his computer checks.  The court concludes these issues would have been resolved had Wells obtained registration and insurance documents, as discussed above, or simply requested a return on the license plate earlier in the stop.  The court thus finds it unnecessary to conclude here that these missteps independently amount to a lack of diligence causing unconstitutional delay.  But they are concerning and may suggest a need for training on United States-issued border crossing identification cards and naming conventions.

The United States doesn't directly dispute that if Wells had earlier obtained the registration and insurance information he could have more quickly provided information to dispatch.[194]  But it contends the stop would still have lasted as long as it did, because the officers were waiting for a necessary return on Said's driver's license check "even 20 minutes after" it was called in using Said's accurate name:[195]

> Again, however, the evidence demonstrates that even 20 minutes after providing the correct names to dispatch (which in turn was approximately five minutes after providing the incorrect names), Deputy Wells was still waiting on a return he needed to complete the citation.[196]

The United States makes this argument repeatedly in its briefing as an answer to the multiple alleged delays and diversions.[197]  The court finds it unpersuasive for several reasons.

The United States' argument is unsupported by Wells' own actions during the stop and his subsequent testimony at the evidentiary hearing.  Wells testified at the evidentiary hearing that the stop continued as long as it did because he didn't have a licensed driver, and that once there was a license, he could take action to resolve the stop.  Wells in fact decided at the scene to write a ticket when he obtained Saul's license and before he knew whether the return on Said's driver's license check came back.  This course of action seems objectively reasonable, given that Said told Wells multiple times that he did not have a license, and had even been in trouble in Las Vegas for not having one.  Indeed, Wells testified "[d]ispatch had not returned that information

---

[194] The United States agrees it is "possible" Wells would have "realized his error in providing the names of the occupants to dispatch and corrected that earlier." Dkt. 62 at 29.  More pointedly, as discussed above, Wells almost certainly would not have provided erroneous names at all and would not have to correct anything concerning the names.  If he did, that would seem to be unreasonably delinquent.

[195] Dkt. 62 at 29.

[196] *Id.*

[197] For example, the United States argues even if Wells had obtained Saul's license earlier, the stop still would have lasted as long as it did, because "[Wells] would still be left to identify [Said] based on a Visa card . . . ." Dkt. 62 at 26.  And it contends the errors in providing incorrect names to dispatch at the stop's outset could not have prolonged the stop because "20 minutes *after* Deputy Wells requested a license check on [Said] using his full name, he was still waiting on a return from dispatch.  And by then, the K-9 had positively alerted on [Said's] vehicle." *Id.* at 27.

[on Said] to me, and now we did have a licensed driver. And he [Said] told me [he had] no license, so I felt confident I could cite him for that."[198]

And after Richards told Wells he simply didn't know if dispatch had in fact provided the driver's license return for Said or not, neither officer contacted dispatch to prompt the return. Finally, it is important to recall that Wells' own unreasonable actions from the outset—failing to obtain registration and insurance documents or a license plate return confirming Said's correct, full name—delayed running an accurate check using Said's full name until over fourteen minutes into the stop, when dispatch suggested to Wells that it take place.[199]

Second, Wells failed to retrieve Saul's Mexico driver's license that Said offered in the stop's initial moments, obtaining it over eighteen minutes after he learned of it, and over twenty minutes into the stop. This is despite the fact Wells acknowledged Said's offer of the license, but then asked if there was any license "from here." Wells did not ask for Saul's license until the stop had gone on for about twenty minutes and Said once again offered it. Had Wells reasonably processed the information offered, and retrieved the license from the outset, he would have had a basis to resolve the stop much quicker, knowing there was a licensed driver and an impound unnecessary, per Wells' standard practice. As Wells testified, he felt he could resolve the stop after he received the license because he had all the information he needed to complete the citation.

The United States argues Wells would not be required to end the stop simply because he had obtained a license because he could also reasonably take time to "verify its validity,

---

[198] Tr. 58:15-18.

[199] Indeed, that failure to obtain registration and insurance almost certainly resulted in a delay in running even an *inaccurate* search on the truck occupants' names, because Wells was so confused by the border crossing cards.

especially where it was a foreign license and one with which he was unfamiliar."[200]  But even if the court could conclude it is reasonable for a patrol officer to be unfamiliar with Mexican driver's licenses (in addition to border crossing cards, the words 'given name' and 'surname,' and Mexican naming conventions), the actual check required to ascertain the license's validity here added little time to the stop's duration and was not a critical problem.  Instead, the delays pertaining to the license were caused by failing to obtain it from the outset and neither officer doing anything with it to resolve the traffic stop as Richards held the license and other documents in his patrol car.

As noted above, Richards shuffled through the registration, insurance, border crossing cards, and Saul's driver's license while sitting in his car.  But when Bagley arrived on the scene, and Richards handed the documents back to Wells to write a citation "or whatever," Wells quickly returned to ask Richards if Saul's license was "an actual driver's license?  Do I have him drive?"  Though Richards had been holding the license at some length, he still needed "to read it" to ascertain its validity and took it back from Wells.  Richards very quickly reviewed it, handed it back to Wells, and stated, "Yeah, it's a driver's license, but we'll just go from here."  Thus, even assuming it was reasonable for Wells to need to call Richards and wait for him to come to the scene to help, and to review the license for Wells once obtained, the 'validity check' Richards cursorily performed could have been quickly completed when he arrived—about eleven minutes into the stop.

Said also faults Wells for the delays in processing stop-related tasks while Wells was concerned about Said staring at him, and while watching the K-9 sniff at times rather than

---

[200] Dkt. 62 at 26.

expeditiously completing the citation.  Those delays are not as clear as the ones described above, and while they may have been unnecessary, the court cannot conclude they are unreasonable.

Based on the foregoing, the stop was prolonged due to unreasonable delinquency.  The resulting delays caused the stop—over twenty-nine minutes from initiation to when the K-9 sniffed and alerted—to last much longer than needed to complete the traffic-based mission of issuing a citation for window tint and/or unlicensed driver and complete any needed safety checks.  This violated the Fourth Amendment, and now warrants suppression of evidence and statements resulting from the stop.

III. **The Stop's Traffic-Based Mission was Diverted to Investigate Criminal Activity**

In addition to arguing that Wells' actions impermissibly prolonged the stop's traffic-based mission and safety checks due to unreasonable mistakes, Said also argues the officers impermissibly prolonged the stop by shifting from its traffic-based mission to investigate ordinary criminal conduct while lacking reasonable suspicion.  In his briefing, Said did not expressly identify a precise '*Rodriguez* moment' when this diversion occurred, though he did set forth a relatively clear timeline of the delays in moving the stop along and the various investigative actions.  But at oral argument, his counsel more clearly identified such a moment as beginning at least when Wells presents Saul's driver's license to Richards, which, by the court's review, occurred at the 20:53 mark on Wells' video capturing the entire stop from its initiation.  This diversion took place after the K-9 was requested, and while Wells and Richards closely monitored Bagley's progress getting to the scene with the dog.

The United States responds that there simply was no '*Rodriguez* moment.'  But, if there was any diversion, the United States contends it was supported by reasonable suspicion of criminal activity.

The court finds Said is correct that the stop's traffic-based mission was diverted, particularly by Richards, once Wells obtained Saul's license. The diversion lasted at least five and a half minutes, from when Wells handed Richards Saul's license[201] to when Richards tells Wells to write a ticket "or whatever" and hands the license back to Wells[202]—apparently without having yet read it or checked its validity. The court concludes this diversion appears intended to allow time for Bagley and the dog to arrive and conduct a sniff, which occurred over nine minutes after Wells handed Richards Saul's license. This diversion prolonged the stop—compounding the prior delays caused by a failure to follow standard procedures—and was unsupported by reasonable suspicion. Accordingly, it violated the Fourth Amendment protection against unreasonable seizures.

In *Rodriguez*, the Supreme Court held absent reasonable suspicion, a delay adding time to a traffic stop beyond what is reasonably needed to complete the stop's mission is an unreasonable seizure under the Fourth Amendment. There, the delay was about seven or eight minutes, occurring after a citation was issued.[203] Likewise, in *United States v. Frazier*[204] the Tenth Circuit found an officer had caused at least two delays without reasonable suspicion,[205] violating the Fourth Amendment. First, he added time to the traffic stop to locate and arrange for

---

[201] Ex. 3 at 9:45.

[202] Ex. 3 at 15:14.

[203] *Rodriguez*, 575 U.S. at 353.

[204] 30 F.4th 1165 (10th Cir. 2022).

[205] The district court in *Frazier* denied the Motion to Suppress, finding the efforts to arrange a dog sniff did not divert from the traffic mission and extend the stop's duration, but that if they did, they were supported by reasonable suspicion. The Tenth Circuit reversed, finding detour in arranging for the dog sniff was unsupported by the many rationales the government offered (30 F.4th at 1174-78), and further rejected the argument that a later DEA database search helped create reasonable suspicion. The court noted that the later DEA search could not provide reasonable suspicion for the earlier dog sniff arrangements. Moreover, the court found the DEA search also exceeded the ordinary traffic tasks and that the government had failed to show it did not also extend the duration of the stop, compared to what its length would be had the officer diligently carried out the needed tasks. *Id.* at 1179-80.

an officer with a K-9 to come to the scene to conduct a sniff.  Though that alone was a constitutional violation, a second detour—to consult a DEA database (DEASIL) showing license plate readers across the country—"only aggravated that ongoing violation."[206]  Regarding the DEASIL search, the government had argued the diversion did not prolong the stop because the search occurred before dispatch had returned the results of a criminal history check, but the Tenth Circuit found this argument unavailing:[207]

> Under *Rodriguez*, it makes no difference whether an investigative detour occurs before or after the completion of the stop's traffic-based mission.  The question is whether the stop would have ended sooner had the officer continued to work diligently on the traffic-related tasks rather than pursue an unrelated investigation.  Thus, the government must show not only that the search occurred during a period when Mr. Frazier would have been seized anyway, it must also show that the stop would not have ended sooner had the trooper forgone the search and instead continued to work diligently on traffic-related tasks.  It has failed to do so.[208]

In contrast, the Tenth Circuit found no impermissible delay in *Cates v. United States*, where a trooper sent a text requesting a K-9 in the midst of a traffic stop.[209]  There, Trooper Neilson stopped an SUV for speeding, and asked the driver—Cates—for his driver's license, registration, and proof of insurance.[210]  Cates provided his license, but explained the SUV was rented and the agreement was on his phone.  Knowing the agreement could take time to find, Trooper Neilson invited Cates to search for the agreement in his patrol car while the trooper completed paperwork for a warning citation.[211]  While conversing, Trooper Neilson saw Cates'

---

[206] *Id.* at 1180.

[207] *Id.*

[208] *Id.* (citations omitted).

[209] 73 F.4th 795 (10th Cir. 2023).

[210] *Id.* at 799-800.

[211] *Id.* at 800.

hands trembling, several duffel bags in the SUV's cargo area, and refueling canister for butane lighters on the car's passenger seat—an item used to heat methamphetamine vapors to smoke.[212]

As Trooper Neilson walked to his patrol car, he radioed another nearby officer—Trooper Jackson—to come to the stop.  He then waited by his car for Cates to leave the SUV and get to the car.  When Cates got there, Trooper Neilson asked him to sit in the passenger seat.[213] Trooper Neilson texted Trooper Jackson, asking him to run his K-9 around the SUV.  Trooper Neilson then ran the driver's license and continued speaking to Cates about his travel plans.[214] Trooper Neilson learned that Cates had been arrested, then asked him about it.  At that time, Trooper Jackson arrived with his K9, walked past Trooper Neilson's car, and started the K-9 sniff.  This was about three minutes after the stop began.  Trooper Neilson then asked dispatch to check Cates' criminal history.[215]  The dog quickly altered to narcotics both the driver's and passenger's side door, and Trooper Jackson went to Trooper Neilson's car to let him know.[216]  At that point, Trooper Neilson had neither completed a warning for Cates nor received the results of Cates's criminal history check, and Cates still had not provided a rental agreement or proof of insurance.[217]

Under these facts, the court of appeals affirmed denial of Cates's motion to suppress because Trooper Neilson had diligently pursued the stop's mission and did not illegally prolong the stop to arrange for the K-9.  The court explained, "[a]lthough we can imagine other situations in which an officer's decision to arrange for an open-air dog sniff would unreasonably prolong a

---

[212] *Id.*

[213] *Id.*

[214] *Id.*

[215] *Id.*

[216] *Id.* at 800-01.

[217] *Id.* at 801.

traffic stop, this case is not one of them."[218]  Trooper Neilson had contacted Trooper Jackson "while he was walking to his patrol vehicle and was still waiting for Cates to join him."[219]  He took a few second to send a text while Cates was in his car, but Cates was never able to provide the rental agreement or proof of insurance.  Indeed, only after the K-9 alert was he able to find an email showing he had rented the car and thus was authorized to drive it.[220]  Finally, during the three minutes before the K-9 arrived, Trooper Neilson "diligently" kept "executing the tasks incident to a traffic stop, such as running Cates's license and checking for any outstanding warrants."[221]

### A.    Diversion from Traffic Based Mission

In addition to the unreasonable delays previously discussed, the officers halted any diligent work on resolving the stop when Wells handed Richards Saul's Mexican driver's license.  For at least five and a half minutes, they diverted from any further work on the window tint (which was never tested at all before the K-9 alerted) or on any alleged remaining concern about Saul or Said's driver's license.

Instead, the officers discussed Said's body language and compared—sometimes inaccurately—the things Said said to them.  Wells even chatted with a third officer on the scene about his suspicions.  Richards also shuffled through the documents and cards he held, but it is unclear what the purpose of this was.  Indeed, it appears he was not scrutinizing anything to further the stop's resolution, where he later still needed to read Saul's license when Wells asked

---

[218] *Id*. at 807.

[219] *Id.*

[220] *Id.* The court of appeals agreed while an "inability to produce a rental agreement 'cannot justify continued detention for the purpose of investigating drug trafficking,'" an "'inability to produce a rental agreement may justify continued detention for the purpose of investigating his authority to drive the vehicle.'"  73 F.4th at 807 (quoting *Frazier*, 30 F.4th at 1777).

[221] *Id.*

him if it was a valid license.  Richards also slowly re-checked the truck's license plate information to "quality check" the information he already had, a seemingly unnecessary task. And though they did not know if dispatch had returned information on Said's own driver's license, neither officer followed up with dispatch to check.  But the officers did discuss where Bagley was, how fast he was driving, and that they hoped he would arrive soon.  And when the K-9 arrived, Richards handed the documents he held back to Wells and told him he could complete the citation, "or whatever."

During this diversion, no work appears to have been done to complete the stop, and no information appears to have obtained to add to what the officers knew before it.  As discussed at length above, the court is unpersuaded for several reasons by the United States' argument that the officers were still waiting for the check on Said's driver's license before they could begin to work on the citation—and if it was needed, the officers reasonably should have worked to obtain it from dispatch.  The diversion thus prolonged the traffic-based mission of stop for at least five and a half minutes.  And from their conversation and actions, the diversion from completing the stop appears designed to allow time for Bagley to arrive with his dog and conduct a K-9 sniff, which occurred over nine minutes after Wells handed Richards Saul's driver's license.[222]  This amounts to a '*Rodriguez* moment.'

---

[222] Wells testified if he had to manually complete the citation, it would take about five to seven minutes.  The manual entry was only necessary if Said's driver's license information was not available to auto-populate the citation—something that was not clearly established, where Richards simply didn't know if dispatch had provided a return and no officer followed up on that lack of information.  But even if the court were to accept that Wells would need to manually prepare the citation, and accepted as relevant Wells' own estimate that he needed up to seven minutes to complete a citation, the citation would still have been completed before the dog sniff began.  Moreover, this diversion which clearly prolonged the stop by itself—setting aside the unreasonably lengthy prior delay cause by failures to follow procedures and process information.

**B.      The Diversion Was Not Justified by Reasonable Suspicion**

The United States argues that even if a *Rodriguez* moment is found, the officers "had reasonable suspicion of criminal activity at that moment, allowing [Said's] seizure to be extended."[223]  In its briefing, the United States identifies the following as grounds for such suspicion:

1.   The truck's rolled-down windows;[224]

2.   The fact that Said and Saul were from Sinaloa, Mexico originally;[225]

3.   The brothers' implausible travel plans;[226]

4.   Said's lack of precise knowledge of when his brother arrived in the United States;[227]

5.   Said's nervousness;[228]

6.   Said's apologies and offers to remove the window tint;[229]

7.   Said's staring at Wells;[230] and

8.   Said's willingness to volunteer information, particularly about his work.[231]

Said counters any alleged suspicion is not reasonable, but rather based on "subjective, unparticularized hunches."[232]  The court agrees.

---

[223] Dkt. 62 at 34.

[224] *Id.* at 35.

[225] *Id.* at 37.

[226] *Id.*

[227] *Id.* at 36.

[228] *Id.*

[229] *Id.* at 35.

[230] *Id.*

[231] *Id.* at 36.

[232] Dkt. 61 at 20-21.

"Reasonable suspicion is a particularized and objective basis for suspecting criminal activity."[233]  To find it, courts "consider both the quantity of information possessed by law enforcement and its reliability, viewing both factors under the totality of the circumstances."[234] It should be supported by "articulable facts that criminal activity 'may be afoot'"[235]—something more than "inchoate and unparticularized suspicion or 'hunch'"[236]  The United States "bears the burden of satisfying this standard, but it is not an onerous one."[237]  It can be established, however, with only the facts "known to the [officer] at the point he [or she] diverted from [the] traffic-based mission . . . ."[238]

"Under this totality approach, factors consistent with innocent travel may collectively amount to reasonable suspicion."[239]  Moreover, with "the specialized training and experience that law enforcement officers have, [courts] generally defer to their ability to distinguish between innocent and suspicious behavior, but deference becomes inappropriate when an officer relies on a circumstance incorrigibly free of associations with criminal activity."[240]

The court finds the factors the United States cites to support a finding of reasonable suspicion, considered in their totality and when the '*Rodriguez* moment' occurred, at best support only an insufficient hunch about criminal activity.

---

[233] *Leatherwood v. Welker*, 757 F.3d 1115, 1120 (10th Cir. 2014) (citing *United States v. Mabry*, 728 F.3d 1163, 1167 (10th Cir. 2013)).

[234] *Id.*

[235] *United States v. Sokolow*, 490 U.S. 1, 6 (1989) (quoting *Terry,* 392 U.S. at 30).

[236] *Id.* (quoting *Terry*, 392 U.S. at 27).

[237] *Frazier*, 30 F.4th at 1174 (citing *United States v. Kitchell,* 653 F.3d 1206, 1219 (10th Cir. 2019)).

[238] *Id.*(citing U*nited States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018).

[239] *Leon*, 80 F.4th at 1165 (citations omitted).

[240] *Frazier*, 30 F.4th at 1174 (quotations omitted).

### 1. Windows Rolled Down

Wells first found it suspicious that all four of the truck's windows were rolled down after the truck stopped, because it suggested the occupants might be airing the truck out to "hide an odor of alcohol or marijuana."[241]  On this point, the United States cites *United States v. Bravo-Ortega,*[242] stating "the court factored in 'that both front windows were rolled down even though it was early February and cold outside.'"[243]  But while rolled down windows might be suspicious in some circumstances, it bears noting that the rolled down windows in *Bravo-Ortega* were something the trooper testified "contributed to his reasonable suspicion of criminal activity,"[244] but not mentioned by the court in its evaluation of whether that suspicion was justified.

In any event, the court agrees with the United States that the four rolled-down windows might initially suggest the possibility that the truck's occupants were trying to dissipate an odor. But under the circumstances here, and as the events unfolded, the amount of suspicion this might have initially created was minimal and never bolstered.  There is no testimony that any odor was ever detected, let alone investigated.  As Said points out in his briefing, no officer asked him to roll up the windows either to contain a smell or even further investigate the reason for the initial stop—the too-dark tint.[245]  When Wells approached the truck initially, he went to the passenger side, but Said as the driver might have expected him to talk to him on the driver's side, thus making it understandable to have at least the front driver and passenger windows down.  And, as defense counsel argued at oral argument, having all windows down may have been an attempt to

---

[241] Tr. 21:15-18.

[242] 621 F.Supp.2d 1159 (D.Utah 2008).

[243] Dkt. 62 at 40 (citing *Bravo-Ortega*, 621 F.Supp.2d at 1163-64).

[244] *Bravo-Ortega*, 621 F.Supp.2d at 1163.

[245] Dkt. 61 at 19.

be transparent about the truck's contents or occupants—especially since the tint was dark.[246]  It did not appear to be an especially cold spring evening, such that having windows down would create discomfort for the occupants.  It was sunny outside, no one wore coats or had visible breath vapor, and Said and Wells conversed about how the weather had been getting warmer.[247]  Indeed, at one point, Wells rolled down his own window after sitting in his patrol car for a few minutes.  On balance, any initial suspicion created by all windows being rolled appears slight.

### 2.  Drug Hubs or Destinations

The United States argues one of the "key fact[s] that support"[248] the officers' finding reasonable suspicion was that Said and Saul were "from Sinaloa, Mexico," because there is a notable drug cartel in the area.[249]  But the Tenth Circuit has explained that identification of a defendant traveling to or from a "drug hub or destination" adds little if anything to a reasonable suspicion calculus.[250]  This is because "law enforcement officers have offered countless cities as drug source cities and countless others as distribution cities," rendering "the probativeness of a particular defendant's route . . . minimal."[251]  The United States cites no case supporting the court's consideration of this fact to find reasonable suspicion, and does not respond to the cases

---

[246] And, at oral argument, defense counsel noted the concern about appearing non-evasive may reasonably be heightened for persons of color, like Said and Saul.

[247] At oral argument, defense counsel proffered that internet research via Google revealed the high temperature that day was forty-nine degrees.  It is not known what the precise temperature was at about six in the evening, but as noted, it did not appear to be uncomfortably chilly.

[248] Dkt. 62 at 35.

[249] *Id.* at 37.

[250] *See Leon*, 80 F.4th at 1166 (citations omitted); *see also United States v. Guerrero*, 472 F.3d 784, 787–88 (10th Cir. 2007) (noting "fact that the defendants were traveling from a drug source city—or, as Deputy Rhodd first noted upon approaching the car, a drug source state [California]—does little to add to the overall calculus of suspicion. . . .").

[251] *United States v. White*, 584 F.3d 935, 951-52 (10th Cir. 2009).

Said cites undermining the probativeness of this fact.[252]  The fact that Said had lived in Sinaloa as a child, and his brother had traveled from there to visit him, merits no weight under these circumstances.

### 3.  Implausible Travel Plans and Purposes

The United States argues Said's travel plans were highly implausible—an eleven- or twelve-hour trip from Las Vegas to Denver on Saturday and returning sometime on Monday. Richards also found in implausible that Said worked in drywall and was traveling to Denver to help a friend with patching because Richards didn't think Said's hands looked like those of one who does physical labor because "they looked soft."[253]  But Richards also testified he was a foot

---

[252] *See* Dkt. 61 at 17-18.  The United States offers in a footnote in its briefing that it was suspicious that Said mentioned  "two other subsequent locations in Mexico" when he was redundantly asked where he was from.  Dkt. 62 at n.181 (citing Tr. 92:12-25).  This argument is unpersuasive.  Said had already answered he was originally from Sinaloa but lived in Las Vegas.  When asked for a second time where he was from, Said is depicted on Wells' body camera footage taking his hands out of his pockets to use his arms to gesture as he describes the three places as though showing where they are in proximity to Sinaloa, stating "Sinaloa, Sonora, and [the third place name, which may be Mochi or Mucha]."  Ex. 1 at 17:25.  The United States does not offer this context, nor does it supply the third place name.  Sonora and Sinaloa are neighboring states in Mexico, and it may well be that Said was referring to an area or a city between them.  It is simply unclear, and no officer asked any follow up questions.  Richards, when questioned about this exchange admitted he did not know Mexican geography or if the third location mentioned was a city in Sinaloa:

> Q.      Okay.  All right. Now, you talked a little bit about locations.  Are you aware that Mucha is a city?
>
> A.      No.
>
> Q.      Okay.  Would it surprise you if I told you that Mucha is a city inside of Sinaloa?
>
> A.      That's knowledge to me today.
>
> Q.      And then are you familiar with the fact that if you travel from Sinaloa to America you have to go through Sonora, the state of Sonora?
>
> A.      I knew that Sonora was a state, but I didn't know the city—
>
> Q.      So you don't know the geography—
>
> A.      Right.
>
> Q.      --of those places, but you recognize them as places in Mexico?
>
> A.      Yes.

Tr. 106:25-107:1-11.

[253] Tr. 90:4-9.

or so away from Said and never touched his hands.[254]  Moreover, Said's hands were in his pants pockets nearly all the time he was outside of his truck answering questions.

Implausible travel plans may "contribute to reasonable suspicion"—such as "when 'it beg[s] credulity to think that the purported purpose of the trip could justify [them].'"[255]  But the Tenth Circuit states "we have 'been reluctant deem travel plans implausible—and hence a factor supporting reasonable suspicion—where the plan is simply unusual or strange because it indicates a choice that the typical person, or the officer, would not make."[256]  Similarly, the court of appeals has expressed reluctance to find suspicion in "unusual travel purposes, at least absent lies, inconsistencies, and the like."[257]  And the arguable weight of alleged suspicion on these points may lessen if an officer asks no follow-up questions.[258]

The United States argues Said's roundtrip travel from Las Vegas to Denver is unlikely for the vast majority of the innocent traveling public, particularly where the traffic stop in Utah took place a little before 6:00 p.m. on Saturday and Said planned to be "back to Las Vegas approximately 36 hours later"[259]—which would be 6:00 a.m. Monday morning.  But it first bears noting there is nothing in the record suggesting Said planned to be in Las Vegas by 6:00 a.m, or even the morning on Monday.  Said stated he needed to be back at work as a foreman on Monday but does not offer a specific time of day when his supervisory work needed to begin.

---

[254] *Id.*

[255] *White*, 584 F.3d at 951-52 (quoting *United States v. Lopez*, 849 F.3d 921, 927 (10th Cir. 2017)).

[256] *Id.* (quoting *Simpson*, 609 F.3d at 1149) (other citations omitted).

[257] *Lopez*, 849 F.3d at 927.

[258] *See Leon*, 80 F.4th at 1166 (noting the Defendant answered the travel-related questions concerning an allegedly suspiciously long road trip "from Phoenix to Denver," and while "[f]urther questioning may have elicited inconsistencies or vagueness," the court of appeals could not "say that . . . answers to questions actually asked contributed to reasonable suspicion.").

[259] Dkt. 62 at 40.

And no officer followed up to get this information.   But even if it were morning, the plans are unusual, but not implausible, particularly considering there were two adult drivers in the truck who could take turns and the stated purpose of the trip—to help a friend with a house project to get it ready to sell.

Still, arguing the Saturday-to-Monday travel plan begs credulity, the United States cites *United States v. Simpson*.[260]   There, the stopped driver had told the officer he had driven all the way from Nebraska to Reno to stay at a friend's house, had not gone to any casinos, offered odd details about where he stayed but was evasive about the host friend's name, and offered inconsistent answers about how long his stay was—one day or a "couple."[261]   The court of appeals credited the officer's belief that the driver was being evasive, but found that the driver's "travel plans by themselves were of limited significance" (the long drive for a relatively short stay), and gave "no weight" to the failure to gamble in a casino.[262]   Indeed, the court noted that if the driver's "evasiveness about his 'bizarre' travel plans were the only factor being used to establish reasonable suspicion, it would be insufficient by itself. . . ."[263]   But, "in conjunction with the other factors presented"—including the driver's known criminal history in drug transportation and extreme nervousness (trembling)—the court gave "some weight" to the unusual, evasively-described, and conflicting travel plans.[264]

Like the *Simpson* defendant*,* Said's travel plans were notably ambitious, but far from implausible—particularly where there were two adult drivers.   But in contrast to the *Simpson*

---

[260] 609 F.3d 1140 (10th Cir. 2010).

[261] *Id*. at 1151.

[262] *Id.* at 1152.

[263] *Id.*

[264] *Id.*

defendant, Said was not evasive about his plans.  And despite the officers parroting to each other what he had said, sometimes with embedded misunderstandings, Said was consistent about the length and purpose of his trip.  Finally, regarding Richards' suspicion about Said's "soft" hands, the court finds this merits no weight.  The record evidence, including Richards' testimony, provides an insufficient basis for this observation.  And as noted, the body camera footage makes it difficult to ascertain how Richards could form that impression.

### 4.  Not Knowing More about His Brother's Travel

Richards found suspicious Said's answers to questions about his brother Saul's travel—specifically, the dates he arrived in the United States from Mexico and when he planned to return.  Richards testified that when asked how long his brother had been in the country, Said said "[a] month or maybe two, a month or two," and that Said also told him his brother was returning to Mexico in a week.[265]  Richards thought this was suspicious for two reasons.  First, he believes that when family "is coming from out of the country to visit with you, you generally know the date they got there."[266]  Second, Said had explained that his brother had family that had "stayed in Mexico," but Richards' own "wife would be upset if I went on vacation and left her home, so"[267] that seemed implausible to Richards.

Little weight can be afforded Richards' suspicions, largely based on his own perceptions of what a normal family member would do or think, and not based on any objective facts or specialized law enforcement training.  This is particularly true where he asked Said no follow up questions on these matters, such as whether Saul had visited other family before reaching Said in Las Vegas, or if the "family" in Mexico included even a wife—something that is simply not in

---

[265] Tr. 88:14-21.

[266] Tr. 88:22-25, 89:1-5.

[267] *Id.*

the record.  But even if it were a spouse, this suspicion ignores the reality that a person traveling internationally might well stay a long time to visit extended family during the length of a permitted visa while a spouse returns to or remains at home to work, care for children, or tend to other commitments.  In sum, the officers lacked adequate information about the travel to form an opinion meriting significant weight and did not follow up to obtain that information.

### 5.  Nervousness

The United States argues the officers' found Said to be "extremely nervous," exhibited specifically by lip-licking and profuse sweating.[268]  The court gives no weight to this alleged nervousness.

The Tenth Circuit has "consistently held that ordinary nervousness bears little weight in the reasonable suspicion calculus."[269]  Understandably, "most motorists experience some degree of nervousness when stopped by the police and 'unless the police officer has significant knowledge of a person, it is difficult, even for a skilled police officer, to evaluate whether a person is acting normally for them or nervously.'"[270]  But "somewhat more weight is given to extreme and persistent nervousness," supported by "'specific indicia that the defendant's nervousness was extreme, rather than credit an officer's naked assertion.'"[271]  For instance, the court of appeals has found extreme nervousness when exhibited by physical manifestations, such as uncontrolled shaking.[272]

---

[268] Dkt. 62 at 36.

[269] *Leon*, 80 F.4th at 1167 (quoting *Simpson*, 609 F.4th at 1147).

[270] *Id.* (quoting *Simpson*, 609 F.4th at 1147-48).

[271] *Id.* (quoting *Simpson*, 609 F.4th at 1148).

[272] *Id.* (citing *Simpson*, 609 F.4th at 1148); *see also U.S. v. Pettit*, 785 F.3d 1374, 1380-81 (10th Cir. 2015) (finding facts that driver's entire arm was shaking, his body was trembling, and he repeatedly told the officer he was nervous acceptable as signs of abnormal nervousness).

These principles are illustrated in the court of appeals' recent discussion in *United States v. Leon*.[273]  Among other things, the government argued a trooper had reasonable suspicion to delay a traffic stop to seek information related to possible drug trafficking because the driver was "'super nervous' because he was 'overly cooperative,' provided 'drawn out or roundabout answers,' and tried to control . . . the conversation.'"—where he had changed the subject from the weather to something else.[274]  This alleged nervousness did not lessen after the driver was told he would receive only a warning.[275]

The Tenth Circuit noted while the district court considered the driver's nervousness, it did not "find he was extremely nervous"—nor could it where the "evidence does not support that finding."[276]  There were no physical signs of extreme nervousness, and he "was cooperative and offered explanations to questions posed by [the trooper]."[277]  Though the trooper believed the driver offered "an inordinate amount of detail or engaged in unnecessary concertation," the court of appeals found it a "natural" response to the questions the trooper asked, and could also have simply reflected the driver's "communication style rather than nervousness."[278]  While acknowledging the trooper's training and experience, the court found the alleged nervousness bore "negligible weight in [its] calculus."[279]

---

[273] 80 F.4th 1160.

[274] *Id.* at 1168.

[275] *Id.*

[276] *Id.*

[277] *Id.*

[278] *Id.*

[279] *Id.*

The United States contends Said's extreme nervousness was evident when Richards saw "some lip-licking, licking his lips," and profuse sweating despite purportedly cold weather.[280] The court observes no "profuse" sweating in the body camera video at all, including on Said's face or as markings on his light orange shirt (he wore no jacket).[281]  Additionally, the lengthy body camera footage from both officers undermines the United States' argument that Said appeared extremely nervous.  He is apologetic, asks to fix the tint problem, provides requested documentation, follows all instructions, freely answers all questions, and converses with the officers over several minutes.  Outside the truck, he appears to stand calmly, hands usually in his pants pockets.  He licks his lips a few time standing in what appears to be sunny, windy weather, which does not seem unusual.  He is not trembling, fidgeting, looking around or moving oddly. At most, he seems perhaps mildly nervous and somewhat concerned about providing information, fixing the tint problem, and ending the stop.

### 6.  Apologizing and Offering to Take Off the Window Tint

Somewhat related to the nervousness calculation, the United States argues the officers were reasonably suspicious of Said because he was both 1) too apologetic and eager to remove the offending window tint, and 2) Wells found the fact that Said apologized for what Wells knew was a minor infraction—too-dark window tint—was suspicious and made him think "[j]ust that maybe there was a small amount of marijuana or something in the vehicle."[282]

Both Wells and Richards found it suspicious that Said offered multiple times to rip off the window times.  Wells testified this was "out of the normal," because most people traveling

---

[280] Dkt. 62 at 36 (citing Tr. 54:7-11, 86:15-18, 103:12-13).

[281] And while it may have been chilly, no one in the body camera footage (four officers, Said, and Saul) is wearing a jacket or coat.  It is sunny.  No breath vapor is visible when anyone speaks.  Officer Wells rolls down his window while he sits in his car.

[282] Tr. 21:18-25, 22:1-6.

out of state, when I stop them for a window tint, they just say, 'Oh well, I don't live here so it is not an issue.  I will just return home,' and that's usually then end of that."[283]  At that time, Wells had been patrolling on his own "for probably a couple of weeks."[284]  Richards thought this offer was suspicious as well, because window tints "are pretty expensive," though he didn't actually know the "dollar amount" they might cost.[285]

The United States cites a 2005 unreported case from this district, *United States v. Gallardo*,[286] for the proposition that "the court found that the defendant's willingness to remove the vehicle's window tint on scene added to the reasonable suspicion."[287]  There is no such finding in this case.  There, the initial stop was for a window tint too dark under Utah law, but a check of the driver's license revealed it was not valid.[288]  When the officer returned the driver's papers and gave him a warning for the tint and lack of a valid license, the driver "asked if he could go to the next town (approximately seven miles away) to get the window tinting removed," the officer asked the driver how he would do that, when he didn't have a license.[289]  There are

---

[283] Tr. 15:16-22.

[284] Tr. 8:21-23.

[285] Tr. 77:17-24.

[286] 2005 WL 2087859 (D.Utah Aug. 26, 2005).

[287] Dkt. 62 at 39.

[288] 2005 WL 2087859 *3.

[289] *Id.*

several facts listed in the case as reasons the officer became suspicious of the driver,[290] and that the court found supported,[291] but the request to remove the tint is not one of them.

The court finds nothing suspicious about Said apologizing in the manner depicted on the body camera footage and offering to take the window tint off. It seems a normal reaction to apologize to a police officer for a traffic violation. And it seems entirely understandable for Said to want to fix a fixable problem, if possible, both to remedy the existing violation and to avoid being stopped again for the same violation. This is particularly true where Said planned to keep driving through Utah that day on to Denver—not to "return home"—and then return on Monday. His too-dark tint could warrant additional stops by Utah law enforcement repeatedly unless he did something to fix it. This is true even if the tint was "expensive"—a statement for which Richards offered no specific factual support. But more important—Said told Wells from the outset of the stop (one minute into Wells' body camera footage) that he had just gotten the tint installed in Las Vegas, he had been concerned it might be too dark, and the installer had offered to "replace" it if that turned out to be true.[292]

### 7. Locked Eyes

Wells testified that at some point while Said was still in his truck, he had locked eyes on Wells, intently watching his movements in a way that Wells found concerning. Richards later

---

[290] *Id.* The officer summarized his suspicions as based on the following:

> Based upon [Mr. Gallardo's] nervous behavior, his story about where he was going, where he was coming from, how long he was there, how he got there, how he was getting to where he was going, how the owner was going to reacquire their vehicle, who the owner was, how he came in contact with that, who his brother was, and the fact that he didn't even know his brother's telephone number. The whole story just didn't seem plausible to me.

[291] *Id.* at *7 (finding, among other factors, reasonable suspicion was supported by the driver's inability to provide proof of insurance, his not knowing the vehicle owner's name, multiple recent trips between Kansas and California, that the vehicle owner was going to fly from California to Kanas to retrieve their car, and the driver's extreme nervousness evidence by constant trembling).

[292] Ex. 1 at 1:02.

testified that this intense focus could signal a potential threat or be a sign someone is "anxious to get out of the stop."[293]  Said responds that this alleged 'tunnel vision' cannot add to the suspicion calculus because "he had no prior acquaintance with the [truck] occupants which would enable him to contrast their behavior in the vehicle with their usual demeanors."[294]

In *United States v. McRae*[295] the Tenth Circuit affirmed a finding of reasonable suspicion during a traffic stop based on: 1) implausible travel plans (a driver stopped in Utah stating he retuned the car and was driving to a wedding in New York when the agreement said the car was due to be returned in Los Angeles two days later); 2) nervousness and an untruthful answer to questions about a criminal record; and 3) the fact that when the experienced police officer returned to his car to conduct stop-related business, the driver "adjusted his [rear-view] mirror and intensely watched [him]."[296]  "Deferring to 'the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions,'" the court of appeals found "the district court did not err in finding [the officer] credible" and that the behavior could contribute to reasonable suspicion of unlawful conduct.[297]

The court gives some weight to the initially intense focus, locked eyes, or 'tunnel vision,' Wells witnessed.  But whatever threat (or, as Richards speculated, anxiety) Wells thought was possible in that moment, he then also interacted at length in conversation with Said, and could observe his demeanor and behavior.  Aside from this early moment of intense focus, there is nothing else during the stop that Wells, or Richards, identified as threatening.  And if Wells felt

---

[293] Tr. 97:4-11.

[294] Dkt. 61 at 17.

[295] 81 F.3d 1528 (10th Cir. 1996).

[296] *Id.* at 1534.

[297] *Id.* at 1535 (quoting *United States v. Martinez-Cigarroa*, 44 F.3d 908, 912 (10th Cir. 1995) *cert. denied*, 514 U.S. 1029 (1995).

any threat, he took no steps to address it.  He did not ask Said to exit his truck or join him in the police car while he ran checks, for example.  And he interacted at length in subsequent questioning, conversation, and exchanges with Said—all of which appeared entirely non-threatening and apologetic.

### 8. Volunteering Information

Last, the United States argues the officers were suspicious because Said volunteered information, particularly about his work history.  In Richards' his experience, people "don't go into great detail" about their work history during a traffic stop, "especially when it wasn't even asked about."[298]  The United States in its briefing does not specify the factual details Said provided, but had not been asked about.  And a review of the body camera footage reveals Said was, in reality, asked for a lot of details about his family (including whether his brother or he had kids), travel plans, truck (including where he got the loan for it and—twice—the name of the uncle who co-signed for it), and his work.  The questions related to Said's work, including from Richards, who inquired about whether Said only did drywall, whether he earned 'good money,' whether he had work in Denver, and what was in the construction-related buckets in the back of the truck.  Said appeared forthcoming and cooperative in his answers.  Under these circumstances, the court gives no weight to the suspicion Richards claims to have developed because Said offered details about his work.

In totality, the factors supporting the officers' expressed concerns about criminal activity do not rise to the level of reasonable suspicion.  The concerns about the rolled-up windows and Said's locked eyes might have caused some initial concern, but neither was investigated or

---

[298] Dkt. 62 at 36.  The United States cites Tr. 8:5-11, and states that it is Wells' testimony.  The testimony discussed is actually found at Tr. 87:5-11 and comes from Richards.

addressed further.  And as the stop progressed, nothing corroborated those initial concerns—no odor was detected in the truck and throughout the stop Said appeared entirely cooperative, apologetic, and non-threatening.  And the remaining factors do not contribute to reasonable suspicion under all the circumstances.

Accordingly, the five and a half minute '*Rodriguez* moment' in this stop—the diversion from resolving the traffic stop's mission when Wells handed Richards Saul's license and the two officers discussed Said's body language, their own suspicions, and appeared to be waiting for Bagley and the K-9—was unwarranted and impermissibly prolonged the stop in violation of the Fourth Amendment.

### IV.   The Remedy for the Fourth Amendment Violations is Suppression of the Evidence and Statements

As discussed above, the stop's traffic-related mission was unreasonably delayed and diverted without reasonable suspicion, prolonging the stop in violation of the Fourth Amendment.  Thus, as Said argues, "the exclusionary rule requires suppression of all physical evidence obtained by the government and all statements made by [Said] after the unreasonable extension of the traffic stop of [Said's truck]."[299]

### CONCLUSION

Said's Motion to Suppress the evidence and statements obtained from the traffic stop on March 18, 2023 is GRANTED.

DATED this 10th day of May 2023.

BY THE COURT:

_____

The Honorable Robert J. Shelby
Chief United States District Court Judge

---

[299] Dkt. 61 at 21; *see United States v. Reed*, 195 F. App'x 815, 824 (10th Cir. 2006) (exclusionary rule bars "government from using evidence against an accused if [it] was obtained through an illegal search or seizure.") (citations omitted).